UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| |
|---|
| ROBERT DIGIACOMO,<br><br>         Plaintiff,<br><br>    v.<br><br>STATEBRIDGE COMPANY, LLC, et al.,<br><br>         Defendants. |

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 14-6694
            (JEI)

**OPINION**

**APPEARANCES:**

LAW OFFICE OF ROOSEVELT N. NESMITH, LLC
By: Roosevelt N. Nesmith, Esq.
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
     Counsel for Plaintiff

PARKER IBRAHIM & BERG LLC
By: John M. Falzone, III, Esq.
270 Davidson Avenue
Somerset, New Jersey 08873
     Counsel for Defendant Statebridge Company, LLC

BAKER & HOSTETLER LLP
By: Lesley Mccall Grossberg, Esq.
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, Pennsylvania 19104
     Counsel for Defendants American Modern Insurance Group,
     American Modern Home Insurance Company, and Midwest
     Enterprises, Inc. d/b/a Ameritrac Business Solutions

**IRENAS**, Senior District Judge:

     Plaintiff Robert DiGiacomo ("Plaintiff") took a mortgage

loan from non-party EquiFirst Corporation ("Equifirst") on March

1

17, 2008, secured by real property in West Berlin, New Jersey. (Complaint, Dkt. No. 1 ("Compl.") ¶ 45)[1] Defendant Statebridge Company LLC ("Statebridge") serviced the loan, and pursuant to the mortgage agreement, required Plaintiff to provide proof of insurance on his real property. (Id. ¶¶ 45-46) When Plaintiff failed to do so, Statebridge "force-placed" an insurance policy on the property through Defendant American Modern Home Insurance Company ("American Modern"). (Id. ¶ 47)

Plaintiff filed the instant class action against Statebridge, American Modern, American Modern's corporate parent American Modern Insurance Group ("AMIG"), and Midwest Enterprises, Inc. d/b/a Ameritrac Business Solutions ("Ameritrac"), the wholly owned subsidiary of AMIG that acts as the program manager for American Modern's force-placed insurance programs. (Id. ¶¶ 3-5) Alleging that American Modern, AMIG, and Ameritrac (collectively, "AMIG Defendants") and Statebridge "manipulated the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation," (id. ¶ 7), Plaintiff brings suit against Statebridge for breach of contract, breach of implied covenant of good faith and fair dealing, violation of the New Jersey

---

[1] The Court recognizes that Plaintiff has filed an Amended Complaint (Dkt. No. 58) but understands the amendments to have no substantive effect on the instant motion.

Consumer Fraud Act ("NJCFA"), breach of fiduciary duty, and violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act.

Presently before the Court is Statebridge's Motion to Dismiss Plaintiff's Class-Action Complaint, Dkt. No 9 ("SMTD") for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).[2]  For the reasons below, the motion will be GRANTED in part and DENIED in part.

## I.    Relevant Facts

Plaintiff alleges the following facts in his Complaint. Under a typical mortgage agreement, lenders and servicers have a right to "force-place" insurance upon borrowers who fail to obtain or maintain the requisite insurance coverage on property that secures a loan.  (Compl. ¶ 10)  As is typical, Plaintiff's mortgage agreement with Equifirst requires in Section 5 that Plaintiff maintain insurance against loss by fire, flood, earthquake "and any other hazards . . . for which Lender requires insurance . . . in the amounts (including deductible levels) and for the periods Lender requires."  (Compl. Ex. A, Dkt. 1-2 ("Mortgage Agreement") at 3)  "If Borrower fails to

---

[2] Plaintiff also brings suit against AMIG Defendants for tortious interference with a business relationship and violations of RICO and the NJCFA.  AMIG Defendants filed an Answer (Dkt. No. 25) to Plaintiff's Complaint and do not join the instant motion.

3

maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense." (Id.)  After executing his mortgage agreement in 2008, Plaintiff appears to have made voluntary insurance payments for some time before his coverage lapsed; in any event, Statebridge did not seek to impose force-placed insurance until 2012.  (Compl. ¶ 31)

The agreement makes it clear that borrowers are better off maintaining their own insurance rather than being subject to any coverage that the lender may apply by force:

> Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

(Mortgage Agreement at 3)

However, Section 9 further provides that where Borrower "fails to perform the covenants and agreements contained in" the agreement, "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument."  (Id. at 4-5)

According to Plaintiff's Complaint, Statebridge arranged to purchase force-placed hazard insurance exclusively from AMIG Defendants, even though these insurance plans provided less

4

coverage and cost borrowers such as Plaintiff considerably higher premiums than voluntary insurance. (Compl. ¶¶ 8-9, 26) Statebridge then charged Plaintiff (and other borrowers in the putative class) even higher premiums than was "reasonable or appropriate to protect [their] interest in the Property," because it used the excess amount collected to give itself "kickbacks disguised as 'commissions,' . . . lucrative reinsurance arrangements which included unmerited charges, and/or . . . other financial benefits which are not attributable to the cost of insuring the individual property." (Id. ¶ 26)

"AMIG Defendants have acknowledged that they pay 'commissions' in connection with force-placed insurance," but Plaintiff alleges that these payments are kickbacks for maintaining exclusive agreements with AMIG, rather than "commissions" awarded for legitimate services. (Id. ¶¶ 35, 37) Since no individualized underwriting is required to force-place insurance, Plaintiff alleges that acquisition expenses should be lower, not higher. (Id. ¶ 29) Moreover, the kickbacks incentivize Statebridge "to purchase the high-priced force-placed insurance policies from American Modern, rather than simply renew the lower priced insurance policy obtained by the borrower in the open market," since "the higher the cost of the

5

insurance policy, the higher the kickbacks to Statebridge."
(Id. ¶ 37)[3]

Plaintiff states that in addition to "commissions," AMIG
Defendants returned some of the excessive premiums to
Statebridge via reinsurance agreements:  "while Statebridge
and/or its affiliates purportedly provided reinsurance, they did
not assume any real risk." (Id. ¶ 40)  Consequently, these
"ceded premiums are nothing more than a kickback[.]"  (Id.)

In addition to these alleged kickbacks, Plaintiff claims
that Statebridge used the excess premiums to subsidize a service
AMIG Defendants provide wherein AMIG Defendants monitor or track
Statebridge's entire loan portfolio below cost.

> [B]ecause insurance-lapsed mortgage property
> generally comprises only 1-2% of the lenders' total
> mortgage portfolio, the borrowers, like Plaintiff
> DiGiacamo, who pay these premiums unfairly, bear
> the entire cost to service and monitor or track the
> entire Statebridge loan portfolio.

(Id. ¶ 38)[4]

---

[3] AMIG Defendants stated during oral argument that Statebridge could not
actually buy Plaintiff's original insurance, because they have no insurable
interest in Plaintiff's equity or personal effects, and individual borrowers
such as Plaintiff have access to cheaper voluntary insurance rates that are
not available to commercial parties such as Defendants. (Hr'g Tr. 35-36,
Apr. 23, 2015, Dkt. No. 52)  Because commercial borrowers have such limited
options for purchasing insurance, AMIG Defendants also argue that even if the
kickback scheme alleged were shown to be true, the rate charged would have
been no higher than the rate charged without such a scheme.  The Court does
not reach such a fact-intensive dispute at this stage of litigation.

[4] The Court understands from the Complaint that Plaintiff believes this cost
of monitoring or tracking Statebridge's loan portfolio ought to be spread
across all loans rather than just the 1-2% of loans related to insurance-
lapsed mortgage property but is otherwise a legitimate expense.

Finally, Plaintiff alleges that Defendants[5] overcharged borrowers by charging for time periods when they were already protected (noting that the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") "typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy" (id. ¶ 41)) and by imposing retroactive insurance costs to cover time periods when the property was not insured, even though no damage occurred during the period of the lapse (id. ¶ 30).

Defendants allegedly engaged in these activities with regard to many borrowers but Statebridge informed the instant Plaintiff that it was force-placing insurance on his property on July 6, 2012, to be applied retroactively to January 29, 2012. (Id. ¶ 31)  The five months of insurance charges were then applied to Plaintiff's escrow account, plus interest.  (Id. ¶ 33)  While Plaintiff previously paid an annual premium of $1,165.14 through his voluntary insurer, Defendants' policy increased his premium 17.5% to $1,368, despite dropping his coverage from $289,000 to $152,000 and no longer covering contents, personal effects, or liability.  (Id. ¶ 47)

---

[5] As Plaintiff explains it, "AMIG Defendants generate a premium charge to Statebridge for th[e] retroactive coverage" and "Statebridge then charges the borrower in the amount it was billed from the AMIG Defendants."  (Id. ¶ 30)

## II. Jurisdiction

Though the parties did not address the issue of standing in their briefs, "standing is a jurisdictional matter" raised "[p]ursuant to Rule 12(b)(1)." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (internal quotations and citations omitted).  Therefore, "we are required to raise issues of standing *sua sponte* if such issues exist." *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405 (3d Cir. 2005) (internal quotations and citations omitted).  Prior to reaching the merits of Statebridge's motion, however, the Court must confirm that Plaintiff has established standing to bring this suit.

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992).  Article III constitutional standing requires that (1) plaintiff has suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that a causal connection exists between the injury and the conduct complained of; and (3) that it is likely, not merely speculative, that the injury will be redressed by a

8

favorable decision. *Ballentine v. United States*, 486 F.3d 806, 814 (3d Cir. 2007) (internal quotations and citation omitted).

Moreover, "plaintiffs in a putative class action must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Montanez v. HSBC Mortgage Corp. (USA)*, 876 F. Supp. 2d 504, 512 (E.D. Pa. 2012) (*citing Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 345 (3d Cir. 1999)) (finding a concrete and particularized injury where plaintiffs alleged they paid too much for force-placed insurance, a causal connection where defendants allegedly worked to conceal kickbacks and redundant charges, and redressability where plaintiffs sought the "very conventional remedy" of money damages).

Here, Plaintiff states facts similar to those in *Montanez*: "[o]nce coverage is forced on the property, Defendants charge the borrower, an amount they attribute to the AMIG forced-placed premium, which is either deducted from the borrower's mortgage escrow account by the Defendants or added to the balance of the borrower's loan." (Compl. ¶ 33) But because "plaintiffs in a putative class action must allege and show that they personally have been injured," *Montanez* at 512, it is insufficient to make general statements of injury to the class without specifying injuries to Plaintiff himself. Plaintiff must state whether

charges were deducted from *his* escrow account or whether *his* loan balance increased in a way that made it more difficult to resolve *his* mortgage situation.

Regarding his own finances, Plaintiff alleges that "escrow funds of Plaintiff which were designated to pay insurance, taxes and other items were used to pay non-designated costs of Defendants, including kickbacks, reinsurance fees and ceded premiums, and low cost loan tracking services." (Compl. ¶ 102) Because "general factual allegations of injury resulting from the defendant's conduct may suffice" to state an injury at this stage of litigation, the Court finds this allegation sufficient to state an injury and establish Article III standing at this stage of litigation.[6]

In addition, Plaintiff alleges that Defendants charged him excessive premiums, which constitute an injury regardless of whether he ever actually paid them. For example, Plaintiff alleges that Defendants informed him in a letter dated July 6, 2012, "that insurance charges will be applied to [his] account,

---

[6] As the Court recognized during oral argument, "the typical case here is, there is nothing left in the escrow account" from which Defendants may deduct the premiums. Hr'g Tr. 50. Instead, "[i]t's very likely that [Plaintiff] wasn't paying [the excessive premiums] directly" and that "[i]f he was going to pay [such a premium], he was going to pay it down the line, indirectly in some fashion, and even then, we don't know, because we don't know what equity there was in the property." (Hr'g Tr. 30) Nonetheless, such factual determinations are inappropriate at this stage, and the Court restricts itself to the allegations in Plaintiff's Complaint.

plus interest" and that Defendants "charged his account the
prior month for the five months of insurance premiums" they
claimed he owed since the lapse of his previous policy.  (Compl.
¶ 33)  *See also* id. ¶¶ 81 and 85, describing the application of
the charge to Plaintiff's loan balance and against his escrow
account.  Plaintiff does not clearly assert what portion (any or
all) of these charges he actually paid.

A charged fee, though unpaid, can constitute injury.  *See
Barrows v. Chase Manhattan Mortgage Corp.*, 465 F. Supp. 2d 347,
366 (D.N.J. 2006)(finding that plaintiff had standing to claim a
breach of implied covenant of good faith and fair dealing,
because "Plaintiff's contention that Defendants had a duty to
insure the propriety of any *attempt* to collect [the fees
charged] negates Defendants' argument that Plaintiff needed to
have actually paid such fees.")(emphasis added).  Moreover, the
application of allegedly unlawful charges to Plaintiff's loan
balance (Id. ¶ 81) necessarily increased his balance, and this
accumulation of debts may reduce equity, affect credit ratings,
limit borrowing capacity, or otherwise cause a concrete injury
to a plaintiff, even if he never actually pays the debt
accumulated, perhaps due to foreclosure or bankruptcy.

Beyond Article III standing, this Court has statutory
jurisdiction over "any civil action in which the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs" and where "any member of a class of plaintiffs is a citizen of a State different from any defendant." Fed. R. Civ. P. 1332(d)(2). Plaintiff here, a citizen of New Jersey, alleges against Defendants, citizens of Ohio or Colorado, an amount in controversy exceeding $5 million. (Compl. ¶¶ 20-23)

Having confirmed jurisdiction, the Court now turns to the merits of Statebridge's motion to dismiss.


### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In order to survive a motion to dismiss, a complaint must allege facts that raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2).

When considering a Rule 12(b)(6) motion, the reviewing court must accept as true all allegations in the complaint and view them in the light most favorable to the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In reviewing the allegations, a court is not required to accept sweeping legal conclusions cast in the form of factual

12

allegations, unwarranted inferences, or unsupported conclusions. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Instead, the complaint must state sufficient facts to show that the legal allegations are not simply possible, but plausible. *Phillips*, 515 F.3d at 234. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Finally, the Court considers "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). A document forms the basis of a claim when it is "integral to or explicitly relied upon in the complaint." *Id.* (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

## IV. Discussion

Statebridge moves to dismiss Plaintiff's Complaint on the grounds that a) all of Plaintiff's claims are barred by the filed rate doctrine; b) Plaintiff cannot claim breach of contract because Statebridge was not a party to the contract, the contract authorized the actions alleged to be unlawful, and Plaintiff himself violated the contract; c) Plaintiff cannot

claim breach of the implied covenant of good faith and fair dealing, because Plaintiff has failed to allege that Statebridge deprived him of the benefit of his bargain or that Statebridge acted in bad faith; d) Plaintiff cannot claim breach of fiduciary duty, because no such duty exists between a mortgagor and mortgagee; e) Plaintiff cannot claim violation of the NJCFA, because Plaintiff has failed to allege that Statebridge engaged in an unlawful practice or that Plaintiff suffered an ascertainable loss; and f) Plaintiff cannot claim RICO violations, because Plaintiff has failed to allege a RICO enterprise or a pattern of racketeering activity.

The Court considers each of these arguments in turn.

**A. The Filed Rate Doctrine**

Statebridge first argues that all of Plaintiff's claims are barred by the filed rate doctrine, which "provides that a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings brought by ratepayers." *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 913 (D.N.J. 2010) (*citing Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763 (3d Cir. 2009)).

Specifically, "[t]he filed rate doctrine bars suits that challenge the reasonableness of filed rates or that would have the practical effect of causing certain consumers to pay a rate that varies from the filed and approved rate." (SMTD at 25

14

(*citing Smith v. SBC Commc'ns, Inc.,* 178 N.J. 265, 274-75
(2004)))  Statebridge argues that this non-justiciability strand
deprives courts of subject-matter jurisdiction over such suits
and "reflects the courts' 'general reluctance to substitute
their judgment for the judgment of the regulatory agency vested
with primary authority to make such decisions and the courts'
limited ability to determine the reasonableness of rates.'"
(Id. at 26 (*quoting Clark v. Prudential Ins. Co. of Am.*, 736 F.
Supp. 2d 902, 913 (D.N.J. 2010)).

     However, the filed rate doctrine does not apply to bar
claims where "Plaintiffs challenge [Defendant's] allegedly
wrongful conduct, not the reasonableness or propriety of the
rate that triggered that conduct."  *Alston v. Countrywide Fin.
Corp.*, 585 F.3d 753, 765 (3d Cir. 2009).  In *Alston*, the Third
Circuit considered allegations of wrongful conduct involving
unlawful kickbacks.  "Plaintiffs may not sue . . . if they
simply think that the price they paid for their settlement
services was unfair," the Court found, but plaintiffs "may
allege a violation of fair business practices through the use of
illegal kickback payments.  The filed-rate doctrine bars suit
from the former class of plaintiffs and not the latter."  *Id.* at
764 (internal quotation marks and citation omitted).

     Here, Plaintiff alleges that Defendants engaged in an
unlawful, undisclosed kickback scheme, colluding to charge

borrowers rates the borrowers believed were necessary to cover their insurance costs but which were actually used to fund kickbacks to Statebridge, among other improper benefits.  These rates were higher than the voluntary rates borrowers were able to obtain on the open market, but Plaintiff does not allege that they were unreasonable in absolute terms.  Rather, Plaintiff objects to Defendants' allegedly wrongful conduct, which "was neither filed with, nor approved by, the state regulatory agency and thus fell firmly outside the scope of the filed rate doctrine."  (Plaintiff's Opp. to SMTD, Dkt. No. 23 ("Pl.'s Opp.") at 10)

Under New Jersey law, "every insurer shall, before using or applying any rate[7] to any kind of insurance, file with the commissioner a copy of the rating-system[8] upon which such rate is based, or by which such rate is fixed or determined."  N.J.S.A. 17:29A-6.  "No insurer . . . shall give false or misleading information . . . to the commissioner, which will in any manner

---

[7] "'Rate' means the unit charge by which the measure of exposure or the amount of insurance specified in a policy of insurance or covered thereunder is multiplied to determine the premium."  N.J.S.A. 17:29A-1(a).

[8] "'Rating-system' means every schedule, class, classification, rule, guide, standard, manual table, rating plan, or compilation, by whatever name described, containing the rates used by any rating organization or by any insurer, or used by any insurer or by any rating organization in determining or ascertaining a rate and includes any policy form, or part thereof, used therewith."  N.J.S.A. 17:29A-1(d).

affect the proper determination of reasonable, adequate, and

nondiscriminatory rates." N.J.S.A. 17:29A-16.

> If, after examination thereof, the commissioner
> shall find that such rating-systems filed by or on
> behalf of an insurer provide for, result in, or
> produce rates that are unreasonably high or
> excessive, or are not adequate for the safeness and
> soundness of the insurer, or are unfairly
> discriminatory between risks in this State
> involving essentially the same hazards and expense
> elements, he shall issue an order to such insurer
> . . . directing that such rating-systems be altered
> in the manner and to the extent stated in such
> order, to produce rates that are reasonable and
> adequate, and not unfairly discriminatory. . . .
> [Otherwise,] he shall approve such rates[.]

N.J.S.A. 17:29A-7.[9]

Once a rate is approved, "[n]o insurer . . . shall

knowingly charge, demand or receive a premium for any policy of

insurance except in accordance with the respective rating-

systems on file with and approved by the commissioner."

N.J.S.A. 17:29A-15.

Here, Statebridge's filed rating-system was approved, and

the rate that Statebridge charged Plaintiff complied with the

rate on file. However, there is no evidence that Defendants

---

[9] "In making such determination, the commissioner shall consider the factors applied by insurers and rating organizations generally in determining the bases for rates; the financial condition of the insurer; the method of operation of such insurer; the loss experience of the insurer, past and prospective, including where pertinent, the conflagration and catastrophe hazards, if any, both within and without this State; to all factors reasonably related to the kind of insurance involved; to a reasonable profit for the insurer, and in the case of participating insurers, to policyholders' dividends." N.J.S.A. 17:29A-11.

included in their application for approval of their rating-system the portion of the premium devoted to kickbacks, as Plaintiff has alleged.  Such extraneous payments are forbidden as follows:

> No insurer . . . shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent that such rebate, discount, abatement, credit, reduction, favor, advantage or consideration may be provided for in rating-systems filed by or on behalf of such insurer and approved by the commissioner.  No insured named in a policy of insurance . . . shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, or reduction of premium, or any such special favor or advantage or valuable consideration or inducement.

N.J.S.A. 17:29A-15.

Plaintiff DiGiacomo alleges that AMIG Defendants paid and Statebridge accepted, as an inducement to insurance, or after insurance has been effected, kickbacks that would qualify as the sort of payments prohibited by N.J.S.A. 17:29A-15.

The filed rate doctrine cannot offer any protection against such a charge.  While the doctrine precludes a borrower from bringing a claim challenging the rate of force-placed insurance, Plaintiff here is not challenging the rate: a finding in his

18

favor would establish only that Defendants engaged in an
unlawful kickback scheme that was not disclosed to New Jersey
regulators, not cast doubt on any determination such regulators
made that a certain rate is reasonable.  In imposing a rate that
regulators deem reasonable, Defendants may nonetheless engage in
conduct that violates, as Plaintiff alleges, the NJCFA or RICO
statutes or Defendants' contractual and fiduciary obligations.

Statebridge's motion to dismiss Plaintiff's Complaint based
on the filed rate doctrine will therefore be denied.

### B. Breach of Contract

Statebridge next argues that Plaintiff cannot claim breach
of contract because Statebridge was not a party to the contract,
the contract authorized the actions alleged to be unlawful, and
Plaintiff did not perform his own duties under the contract.

### a. Statebridge was plausibly a party to the mortgage contract.

Only a party to a contract can be found liable for breach
of contract, and a loan servicer is not an original party to a
mortgage agreement between a lender and a borrower as a matter
of law.[10]  However, a loan servicer can become a party to a

---

[10] *See Ruff v. America's Servicing Co.*, No. 07-0389, 2008 U.S. Dist. LEXIS
33447, 2008 WL 1830182, at *4 (W.D. Pa. Apr. 23, 2008) ("Defendant America's
Servicing was not a party to the mortgage. Therefore, it cannot be held
liable for breach of contract."); *Cannon v. Wells Fargo Bank, N.A.*, 2013 WL
132450 *22 (N.D. Cal. Jan. 9, 2013) ("[A] breach-of-contract claim cannot be
maintained against Wells Fargo [the loan servicer] as it was not a
contracting party."); *McKenzie v. Wells Fargo Home Mort., Inc.*, 2012 WL
5372120 *20 n.12 (N.D. Cal. Oct. 30, 2012) ("The mortgage contract is between

mortgage agreement between a lender and a borrower via assignment, and whether or not such assignment has occurred is a question of fact. *See Ellsworth v. U.S. Bank, N.A.*, 30 F. Supp. 3d 886, 913 (N.D. Cal. 2014) ("[A] servicer can stand in the shoes of the party to the contract to the extent that rights are assigned. If rights are not assigned, then [loan servicer] U.S. Bank is off the hook for breach of contract."). Not only is it "plausible to infer that 'a servicer can stand in the shoes of the party to the contract to the extent that rights are assigned[]' . . . it is somewhat *im*plausible that the servicers acquired the rights to enforce the lender's rights under the deed of trust without becoming parties to the contract." *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674, at *13 (N.D. Cal. Oct. 1, 2014) (*quoting Ellsworth*, 30 F. Supp. 3d at 913)(emphasis in original). In *Perryman*, as in *Ellsworth*, the Court declared the matter a fact issue for which Plaintiff would need to produce evidence of assignment but found "nothing implausible about the allegation." *Id.*

Here, Statebridge argues that Plaintiff has failed to state a claim for breach of contract, because "a 'servicer' only receives limited rights and obligations under the mortgage

---

Lender and Borrower.  If Wells was acting as servicer, and not as Lender or Lender's agent, when it required increased insurance coverage, it could not be sued for breach of contract since it is not a party to the contract.")).

contract relating to servicing" and Statebridge therefore "does not have the required privity between the parties[.]" (SMTD at 29) However, this question of fact should not be resolved at this stage. For now, the Court notes only that Statebridge is the party listed on Plaintiff's "Evidence of Insurance" form under "Insured / Lender" (Dkt. No. 9-1 at 16) and finds that Statebridge plausibly stands in the shoes of EquiFirst with regard to Plaintiff's mortgage agreement with EquiFirst.

Statebridge's motion to dismiss Plaintiff's breach of contract claim on the basis that Statebridge is not a party to the contract will therefore be denied.

### b. The contract does not authorize Defendants' actions.

Statebridge also argues that the mortgage agreement authorizes Defendants' actions, because it alerts borrower that they must maintain insurance "in the amounts . . . and for the periods that Lender requires," and that if such coverage lapses, the Lender "is under no obligation to purchase any particular type or amount of [force-placed] coverage" which "shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect." (SMTD at 30-31) The agreement further provides that the cost of force-placed insurance "might significantly exceed the cost of insurance that

21

Borrower could have obtained." (Id. at 31) Based on this language, Statebridge concludes that the breaches that Plaintiff alleges "are in fact contemplated by and expressly authorized by the Mortgage." (Id.)

This conclusion is not persuasive. Section 9 of the Mortgage Agreement authorizes a Lender to "do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument." (Mortgage Agreement at 4-5) But Plaintiff has alleged a kickback scheme that imposes costs on the borrower beyond the costs of providing force-placed insurance. In executing the Mortgage Agreement, Plaintiff may have agreed, in the event of a lapse in voluntary coverage, to allow the force-placement of insurance that is more expensive and less protective of Plaintiff's interests than the coverage that lapsed; however, the agreement in no way evidences Plaintiff's consent to or awareness of the alleged kickback scheme driving some portion of those additional costs. In fact, Plaintiff alleges that Defendants used the Mortgage Agreement to suggest that excessive premiums were legitimately necessary to cover the costs of providing force-placed insurance, masking the illegitimate profits Statebridge collected instead. The agreement authorizes no such action, as it is neither reasonable nor appropriate to protect the Lender's interest, and the Court

will therefore deny Statebridge's motion to dismiss Plaintiff's breach of contract claim on that basis.

### c. Plaintiff has not pled his own performance under the contract.

Finally, Statebridge asserts that Plaintiff has not asserted his own performance of the contract.  Specifically, plaintiff satisfies his pleading requirements if he alleges (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed his own contractual duties.  *Pub. Serv. Enter. Grp., Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 219 (D.N.J. 1989) (citing 5 Wright & Miller, *Federal Practice and Procedure,* § 1235 at 189-90).  In other words, "when pleading a claim for the breach of an express contract . . . the complaint must contain some allegation that the plaintiffs actually performed their obligations under the contract."  *R.H. Damon & Co. v. Softkey Software Products, Inc.*, 991 (S.D.N.Y. 1993) (dismissing plaintiff's case for failure to do so).

Here, Statebridge has alleged that "Plaintiff failed to perform his contractual duties under the Mortgage," because he "failed to make timely payments pursuant to the Note and Mortgage" and is thereby estopped from bringing a breach of contract claim against Statebridge under the Mortgage Agreement. (Def.'s Reply at 12)  By nature, Defendants use force-placed

23

insurance only when a mortgagor has failed to maintain insurance
on the property at issue, and the Court recognizes that a
financially distressed borrower failing to make insurance
payments may simultaneously fail to make mortgage payments as
well.  Nonetheless, Plaintiff must show his own performance in
order to collect damages under the contract itself.  Finding
that Plaintiff has failed to do so, the Court will dismiss
Plaintiff's breach of contract claim.

**C. Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiff has, however, stated a claim for breach of the
implied covenant of good faith and fair dealing, because he has
pleaded that Statebridge deprived him of the benefit of his
bargain and that Statebridge acted in bad faith.[11]

The implied covenant of good faith and fair dealing, which
accompanies all contracts under New Jersey law, "mandates that
neither party shall do anything which will have the effect of
destroying or injuring the right of the other party to receive
the fruits of the contract." *Faistl v. Energy Plus Holdings,
LLC*, No. CIV.A. 12-2879 JLL, 2012 WL 3835815, at *6 (D.N.J.

---

[11] Plaintiff need not plead his own performance to assert a claim for breach
of implied covenant of good faith and fair dealing, so long as plaintiff has
asserted the existence of a valid contract.  *See DBA Distribution Servs.,
Inc. v. All Source Freight Solutions, Inc.*, No. CIV.A. 11-3901 JAP, 2012 WL
845929, at *4-5 (D.N.J. Mar. 13, 2012)(rejecting breach of contract claim for
plaintiff's failure to plead its own performance but still reaching implied
covenant claim (and rejecting it on other grounds)).

24

Sept. 4, 2012) (*quoting Seidenberg v. Summit Bank,* 348
N.J.Super. 243, 254 (App. Div. 2002)).

   "A party exercising its right to use discretion in setting
prices under a contract breaches the duty of good faith and fair
dealing if that party exercises its discretionary authority
arbitrarily, unreasonably, or capriciously, with the objective
of preventing the other party from receiving its reasonably
expected fruits under the contract." *Wilson v. Amerada Hess
Corp.*, 168 N.J. 236, 251, 773 A.2d 1121, 1130 (2001).
"Essential to a breach of the good faith obligation is a finding
of improper motive. 'Without bad motive or intention,
discretionary decisions that happen to result in economic
disadvantage to the other party are of no legal significance.'"
*Bartello v. Option One Mortgage Corp.*, No. A-2492-07T1, 2009 WL
137229, at *4 (N.J. Super. Ct. App. Div. Jan. 22, 2009) (*quoting
Wilson*, 168 N.J. at 251).

   It is undisputed here that Statebridge retained
discretionary authority to choose a force-placed insurance
provider.  However, the implied covenant of good faith precluded
Defendants from exercising that discretion "unreasonably . . .
with the objective of preventing the other party from receiving
its reasonably expected fruits under the contract."  Statebridge
argues that Plaintiff cannot meet this standard, because he has

failed to allege sufficient facts showing that Statebridge

deprived him of the benefit of his bargain.  (SMTD 32-37)

In support of this position, Statebridge quotes *Bartello*,

2009 WL 137229, at *5:

> The benefit of [plaintiff]'s bargain under the
> mortgage agreement was to obtain a loan to purchase
> a home.  By allowing the loan to remain in effect,
> and enabling [plaintiff] to keep his home, although
> paying a somewhat higher insurance premium because
> he failed to keep his own insurance in effect,
> [defendant] can hardly be said to have taken action
> depriving [plaintiff] of the benefit of his
> bargain.

(SMTD 32)  In other words, Plaintiff signed the Mortgage

Agreement to obtain a loan to purchase a home and received that

loan, so he cannot now claim a breach of the implied covenant of

good faith.

However, this characterization of Plaintiff's bargain is

incomplete.[12]  In denying a motion to dismiss plaintiff's claim

for breach of an implied covenant, the Court in *Laffan v.*

*Santander Bank, N.A.*, No. CIV.A. 13-4040, 2014 WL 2693158 (E.D.

Pa. June 12, 2014)) observed the following:

> The purpose of a clause in a mortgage allowing a
> lender to force-place insurance is to protect the
> lender's interest in the property that is
> collateral for the mortgage. Plaintiff claims that
> [Defendant] made additional profits at his expense
> by force-placing insurance on his property and

---

[12] *Bartello* is also not as factually similar to the instant matter as
Statebridge suggests.  Despite involving force-placed insurance, *Bartello*
involved no allegations of fraud and kickbacks, as alleged here, only a
dispute over the coverage the force-placed insurance provided.

26

> receiving kickbacks on that insurance, rather than
> placing insurance to protect its interest in the
> property. While the mortgage did not require
> [Defendant] to place the cheapest insurance
> available, it was not entitled to use its
> discretion to obtain secret kickbacks[.]

*Laffan*, 2014 WL 2693158 at *5.

Similarly here, while Statebridge was allowed to force-place insurance "to protect the lender's interest in the property," Statebridge "was not entitled to use its discretion to obtain secret kickbacks." Defendants had the discretion to force-place insurance at a price to be determined by the market, but they were required to exercise that discretion reasonably. Artificially inflating that price to benefit themselves through undisclosed kickbacks, as Plaintiff has alleged, would qualify as an "unreasonable" exercise of their discretion and would therefore breach the implied covenant of good faith and fair dealing.

Statebridge also argues that Plaintiff has failed to allege sufficient facts showing that Statebridge acted in bad faith. (SMTD 32-34)  However, Plaintiff's allegation that Defendants intentionally force-placed insurance upon him with a deliberately undisclosed and unlawful profit motive extraneous to the terms agreed upon in the mortgage contract sufficiently alleges bad faith.  The Court will therefore deny Statebridge's

motion to dismiss Plaintiff's claim that Statebridge breached
the implied covenant of good faith and fair dealing.

**D. Fiduciary Duty**

Plaintiff alleges that Statebridge acted as a fiduciary in
holding Plaintiff's escrow funds and violated that duty by
applying the funds towards undisclosed kickbacks for itself
rather than the legitimate costs of providing force-placed
insurance. Statebridge claims that it engaged Plaintiff only in
a debtor-creditor relationship, which imposes upon Statebridge
no fiduciary duty. (SMTD 37) However, Statebridge's fiduciary
obligation roots from its control over Plaintiff's escrow funds,
independent of its identity as Plaintiff's lender.

"Escrow agents have a fiduciary responsibility to the
parties to an escrow transaction." *Laffan*, 2014 WL 2693158, at
*6 (*citing Snyder v. Dietz & Watson, Inc.*, 837 F.Supp.2d 428,
444 (D.N.J. 2011). In *Laffan*, the Court denied a motion to
dismiss a fiduciary duty claim:

> Plaintiff pled that Defendant held funds in escrow
> for the purpose of paying insurance premiums and
> other items in borrower's mortgages . . . that
> Defendant was obligated to hold, manage and control
> any escrow funds in trust and owed Plaintiff the
> highest fiduciary duty with respect to the handling
> of escrow funds . . . [and] that Defendant breached
> its fiduciary duty to him by, *inter alia*, abusing
> its discretion to buy hazard insurance by knowingly
> paying for items unrelated to providing force-
> placed insurance, such as kickbacks.

*Id.*

28

Similarly, the Court finds here that Plaintiff has sufficiently pled that Statebridge abused its discretion over his escrow funds by funding undisclosed kickbacks unrelated to providing force-placed insurance.  Consequently, Statebridge's motion to dismiss Plaintiff's fiduciary duty claim will be denied.

**E. New Jersey Consumer Fraud Act ("NJCFA")**

"To state a cause of action under the [NJ]CFA, a plaintiff must allege: (1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements — defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 296 (D.N.J. 2009).

In moving to dismiss Plaintiff's claims under the NJCFA, Statebridge argues that Plaintiff's allegations were not an unlawful practice because they were consistent with the Mortgage Agreement[13]; that Plaintiff cannot demonstrate an ascertainable loss pursuant to the filed rate doctrine; and that Plaintiff has failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).  (SMTD at 29-33)

---

[13] Statebridge also argues that the allegations were consistent with the notices that Statebridge provided to Plaintiff regarding the lapse of his primary insurance, but Plaintiff did not include them with his Complaint, and the Court does not consider them at this stage of litigation.

As discussed above, the Mortgage Agreement does not authorize the kickbacks alleged, and the filed rate doctrine does not apply here.  Rule 9(b)[14] requires that a plaintiff alleging fraud "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal citation omitted).  "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  *Id.*

Plaintiff here has alleged with sufficient particularity a fraudulent scheme wherein Defendants led Plaintiff to believe that his higher force-placed insurance premiums were necessary to provide him coverage, when they were actually used to provide kickbacks to Statebridge.  (Compl. ¶¶ 81-82)  These kickbacks were not disclosed to Plaintiff and qualify as a material omission in Statebridge's communications with Plaintiff, such as the July 6, 2012, letter.  Consequently, Statebridge's motion to dismiss Plaintiff's claims under the NJCFA will be denied.

---

[14] Rule 9(b) provides:  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally."

**F. Racketeer Influenced and Corrupt Organizations ("RICO") Act**

Finally, Statebridge seeks to dismiss Plaintiff's RICO claims, which allege mail and wire fraud (Count VII) and RICO conspiracy (Count VIII) under 18 U.S.C. § 1962(c) and (d).[15]

> Establishing liability under [section (c)] of the RICO statute 'requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity,' plus an injury to 'business or property.' . . . Under Section 1962(d), [i]t is also unlawful for anyone to conspire to violate § 1962(c). . . . Section 1961(1) of RICO provides a list of the federal and state crimes which constitute 'racketeering activity' and includes mail and wire fraud, and Section 1961(4) of RICO defines the term 'enterprise' to 'include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'

*In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 269 (3d Cir. 2009) (internal citations omitted).

First, Statebridge alleges that Plaintiff has failed to plead a RICO enterprise, because he "has failed to allege wrongful actions in the conduct of the enterprise" beyond the "procurement of insurance [which] is one of [Statebridge's] duties as a servicer of the Mortgage." (SMTD at 44) However,

---

[15] Part (c) of the RICO statute, 18 U.S.C. § 1962, provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Part (d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

Plaintiff pleads more than mere procurement of insurance; he pleads that Defendants made material omissions and misrepresentations regarding the purposes of the force-placed insurance premiums, "knowingly and intentionally foster[ing] the mistaken impression that the force-placed insurance premiums that Plaintiff was charged represented the 'cost' of the policies and that it was authorized to impose costs of the kickbacks and improper expenses under the Loan Agreement or Mortgage." (Compl. ¶¶ 116-17) Plaintiff also alleges that Defendants "transferred sums among themselves, including but not limited to kickbacks[.]" (Id. ¶ 118) These actions, as alleged, go well beyond Statebridge's duties as a loan servicer.

Second, Statebridge argues that Plaintiff has alleged insufficient facts regarding Statebridge's participation in the enterprise alleged. But Plaintiff alleges, among other things, that Statebridge "directed and controlled the enterprise by . . . drafting of [sic] the language of the letters and correspondence to borrowers that were specifically designed to deceive borrowers related to what the 'cost' of the insurance purchased for them was . . . [and] caus[ing] debits to the borrowers [sic] escrow accounts amounts which are not the actual or effective cost for lender placed insurance." (Compl. ¶ 119)

Finally, Statebridge argues that Plaintiff has not asserted any facts that substantiate his allegations of kickbacks.

32

However, Plaintiff has asserted that "AMIG Defendants have acknowledged that they pay 'commissions' in connection with force-placed insurance," (Id. ¶ 35), that very few insurance companies control virtually the entire market for force-placed insurance (Id. ¶ 15), and that Plaintiff's force-placed premiums were 17.5% higher than his primary insurance (Id. ¶ 47).  The Court finds these facts sufficient to warrant discovery.

Consequently, the Court will deny Statebridge's motion to dismiss Plaintiff's RICO claims.


### VI. Conclusion

For the reasons set forth above, Statebridge's motion to dismiss Plaintiff's breach of contract claim will be granted; the remainder of its motion will be denied.  An appropriate Order accompanies this Opinion.

Date: June 25, 2015


s/ Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**